FILED
DEC 08 2014

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| LIBREMAX OPPORTUNITY MASTER FUND, LP,<br><br>Plaintiff,<br><br>vs.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendants. | CIV. #14-4180<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff LibreMax Opportunity Master Fund, LP ("LibreMax" or "Plaintiff"), by and through its attorneys, states as follows against Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant"):

**PARTIES**

1. Plaintiff LibreMax is a Delaware limited liability company with its headquarters in New York, New York. LibreMax owns and holds Class 1-A-5 Certificates (the "Certificates") in the MASTR Asset Securitization Trust 2007-1 (the "Trust").

2. Defendant Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota. Defendant serves as the Master Servicer and the Trust Administrator for the Trust.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Complete diversity exists because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

1

4.     Venue and jurisdiction are proper because Defendant transacts business and maintains its principal place of business within this jurisdiction and because Defendant performs trust administration and servicing functions from its South Dakota office.

## BACKGROUND – THE TRUST

5.     In August 2013, Plaintiff purchased the entire Class 1-A-5 Certificates in the Trust.

6.     The Trust consists primarily of residential mortgage loans, and is primarily governed by the Pooling and Servicing Agreement dated as of October 1, 2007 (the "PSA") and the Prospectus Supplement dated October 29, 2007 (the "ProSupp").[1]

7.     Trusts of this type are typically administered by two entities: a Trustee, who is the "face" of the Trust with the Trust beneficiaries, and the Master Servicer, who is the "face" of the Trust with the borrowers. In some cases, such as this one, the Trustee assigns some of its rights and obligations to a "Trust Administrator". Here, Defendant served as both Master Servicer and Trust Administrator.

8.     The borrowers on the mortgage loans make their payments to the Trust through the Master Servicer for the Trust. In this case, Defendant was the Master Servicer of the Trust, and responsible to ensure that the loans comprising the Trust were properly serviced.

9.     After Defendant in its role as the Master Servicer collects loan payments from the borrowers, Defendant in its role as the Trust Administrator distributes those payments (less allowable deductions) to the Trust's beneficiaries – the Certificateholders- such as Plaintiff.

10.    The Master Servicer is also responsible for calculating any realized losses and allocating such losses among the Certificateholders. A "Realized Loss" is defined by the PSA to mean:

---

[1] All capitalized terms not otherwise defined in this complaint shall have their respective meanings assigned in the PSA or ProSupp, as applicable.

> With respect to each Mortgage Loan that is a Liquidated Loan, an amount (not less than zero or more than the Scheduled Principal Balance of the Mortgage Loan) as of the date of such liquidation equal to (i) the unpaid principal balance of the Liquidated Loan as of the date of such liquidation, *plus* (ii) interest at the Net Mortgage Rate from the Due Date as to which interest was last paid or advanced (and not reimbursed) to Certificateholders up to the Due Date in the month in which Liquidation Proceeds are required to be distributed on the Scheduled Principal Balance of such Liquidated Loan, *minus* (iii) the Liquidation Proceeds, if any, received during the month in which such liquidation occurred, to the extent applied as recoveries of interest at the Net Mortgage Rate and to principal of the Liquidated Loan. With respect to each Mortgage Loan which has become the subject of a Deficient Valuation, if the principal amount due under the related Mortgage Note has been reduced, the difference between the principal balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation.[2]

11. Because the Master Servicer is collecting on the mortgage loans, the Master Servicer knows in advance what loans are delinquent, what loans are in foreclosure, and what loans are about to be liquidated. Thus, the Master Servicer can project with reasonable certainty when, and in what amount, Realized Losses will affect the Trust.

## BACKGROUND – ALLOCATION OF REALIZED LOSSES

12. The Class 1-A-5 Certificates were divided into four "Components" or classes. These Components are non-severable and include Class 1-A-5-1 ($6,649,158 original face value), 1-A-5-2 ($1,892,312 original face value), 1-A-5-3 ($2,292,192 original face value) and 1-A-5-4 ($226,876 original face value). (Exhibit A, ProSupp at S-7)

---

[2] PSA, § 1.01.

13. The ProSupp for the Trust provides that Plaintiff's Certificates would provide some credit support for the Certificates above them in the waterfall: the Class 1-A-4 Certificates. However, according to the ProSupp, that credit support was limited.

14. The ProSupp provides that the losses for the Class 1-A-4 Certificates would be allocated only to the "Class 1-A-5-4 Component," which is the smallest of the Class 1-A-5 Components. Therefore, the ProSupp capped the losses that could be allocated to the Certificates at the amounts in Class 1-A-5-4, whose value at origination was $226,876. (Exhibit A, ProSupp at S-64.)

15. From the date of the initial offering of the Trust, October 29, 2007, until July 2014, Defendant allocated losses according to the allocation scheme laid out in the ProSupp.

16. Under this allocation scheme, the Class 1-A-5 Certificates purchased by Plaintiff still held a positive balance. Further, according to the ProSupp and according to this initial allocation scheme, Plaintiff's Certificates could only be allocated losses up to the Class 1-A-5-4 "Component," which was $226,876.

17. Beginning in July 2014, however, Defendant changed its allocation method and, without explanation or notice to the Trust's Certificateholders, began allocating losses to the Class 1-A-5 Certificates in excess of the ProSupp's Class 1-A-5-4 $226,876 cap.

18. In a letter dated October 10, 2014, Plaintiff demanded that Defendant continue to allocate losses according to the ProSupp and to re-state the latest remittance report to repair the economic harm suffered by Plaintiff. (Exhibit B, October 10, 2014 letter from LibreMax to Wells Fargo).

19. In response, Defendant stated in an email: "... we confirm that the losses to Class 1A5 for the months in question are accurate per section 4.03(ii) of the deal's pooling and servicing

agreement [PSA], the executed governing document...." (Exhibit C, October 13, 2014 email from Wells Fargo to LibreMax).

20. Under this new scheme, the Class 1-A-5 Certificates were allocated losses suffered by the Class 1-A-4 collateral equal to 22% of the value of the entire shelf of Class 1-A-5 Certificates, and far beyond the value of Component 1-A-5-4 to which the losses should have been capped according to the ProSupp.

21. Upon information and belief, had Defendant allocated losses under the new scheme from the inception of the Trust, the Class 1-A-5 Certificates' value would have been depleted in 2012 and would have been worthless in August 2013, which means Plaintiff could not or would not have purchased them.

22. If Defendant continues to allocate losses according to this new method, and not according to the ProSupp, then the Certificates' value will soon be depleted, making Plaintiff's purchase worthless.

23. As a signatory to the PSA in two capacities, Defendant knew or should have known from the inception of the Trust of any discrepancy between the PSA and ProSupp.

## BACKGROUND – WELLS FARGO RECENTLY FILED A TRUST INSTRUCTION ACTION FOR A SIMILARLY SITUATED TRUST

24. In June 2005, American Home Mortgage Investment Trust, 2005-2 ("American Home Mortgage Trust") issued a series of notes secured by residential home mortgage loans. Defendant was the Master Servicer and the Securities Administrator for American Home Mortgage Trust.

25. The notes were divided into 26 classes, with different classes having different rights to priorities of payment arising from the home mortgage loans.

26. In the event that the home mortgages failed to generate sufficient income to enable the trust to make the payments due to the classes of the notes, the underlying documents provided for the allocation of losses to certain classes before others in a waterfall effect.

27. However, an inconsistency existed in the underlying documents for the American Home Mortgage Trust as to how losses should be allocated between the holders of two particular classes.

28. On January 17, 2014, after determining that shortfalls in principal and interest were likely to arise for the first time that summer, Defendant Wells Fargo, in its capacity as Securities Administrator, filed a petition requesting a court order for instructions as to the allocation of losses between two classes.

29. The name of that case was *In re Trusteeship Created by American Home Mortgage Investment Trust 2005-2*, No. 14 Civ. 2494, 2014 WL 3858506 (S.D.N.Y. July 24, 2014) (*"American Home Mortgage"*).

30. The issue in *American Home Mortgage* was whether the indenture (the New York version of a PSA) or the offering documents (prospectus) should be used to determine allocation of losses for the I-A-2 and I-A-3 Notes. The indenture allocated losses first to the I-A-2 Notes, and then to the I-A-3 Notes. However, the offering documents (prospectus) did just the opposite, providing that losses should be allocated first to the I-A-3 Notes and then to the I-A-2 Notes.

31. The *American Home Mortgage* court, reading both the indenture agreement and the marketing documents together, held that the indenture agreement must be reformed to conform to the marketing documents so that Class I-A-3 Notes would be allocated losses before Class I-A-2 Notes, and directed Wells Fargo, as the Securities Administrator, to allocate losses accordingly.

32. Further, the *American Home Mortgage* court specifically noted that "... the Prospectus and the Term Sheet are the instruments disclosing all material terms and conditions of the placements of the Notes. Unless material discrepancies in the documents are fully revealed to all potential investors, an issuance can be materially misleading, and fraudulent, in violation of the securities laws." *American Home Mortgage*, 2014 WL 3858506, at *20. That court concluded that "[i]t is clear that the drafters intended consistency between the Deal Documents, since any changes in the Indenture would need to be disclosed in supplemental disclosures under the federal securities laws and there were no such disclosures." *Id.* at *22.

## BACKGROUND – FUTILITY

33. The PSA contains the following "No Action" clause:

> No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee or the Trust Administrator a written notice of a Master Servicer Event of Termination and of the continuance thereof, as herein provided, and unless the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee or the Trust Administrator hereunder and shall have offered to the Trust Administrator such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have neglected or refused to institute any such action, suit or proceeding....[3]

34. This provision is inapplicable to this action for numerous reasons, including but not limited to the fact that: (a) this provision is limited to a Master Servicer Event of Termination; and (b) this action concerns Defendant's negligence.

---

[3] PSA, § 11.08.

7

35. If this "No Action" clause applied, Plaintiff would have to offer "to the Trust Administrator such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby," requiring Plaintiff to offer Defendant an indemnity against the "liabilities to be incurred" in this action, which would render this action pointless.

36. It is impossible for Plaintiff to comply with this provision. Plaintiff's class of Certificates, even at its maximum face value, consisted of less than 5% of the total "Voting Rights evidenced by the Certificates". No other Certificateholders have any interest in protecting the Plaintiff's class of Certificates. Some Certificateholders are completely neutral respecting this dispute, while other Certificateholders actually benefitted from Defendant's reallocation of Realized Losses.

37. Plaintiff is seeking to recoup the lost value of its Certificates from Defendant and is not seeking to reform the manner in which Realized Losses are allocated or to recoup from other Certificateholders payments already made.

## COUNT I – BREACH OF CONTRACT

38. Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

39. As Master Servicer and Trust Administrator under the PSA and ProSupp, Defendant services the loans that are deposited into the Trust and administers the Trust "for and on behalf of the Certificateholders."

40. Under the PSA, Defendant in its role as Master Servicer owes the following duties, *inter alia*, to Certificateholders, including Plaintiff:

> a) to "act in a manner consistent with this Agreement ... and with customary and usual standards of practice of prudent mortgage loan master servicers";[4]
>
> b) to "establish and maintain a Collection Account, which account may be deemed to be a sub-account of the Distribution Account, into which the Master Servicer

---

[4] PSA, § 3.01.

8

      shall deposit or cause to be deposited" all principal and interest payments on the Mortgage Loans, Liquidation Proceeds, and other amounts required to be deposited by the Master Servicer;[5]

   c) to promptly deposit in the Collection Account or pay to the Trust Administrator for deposit into the Distribution Account "the amount of any realized losses in the Collection Account…";[6] and

   d) to determine the total amount of Realized Losses, and to "prepare and make available to the Trust Administrator" a statement setting forth the bases for distributions to the Certificateholders.[7]

41. Under the PSA, Defendant in its role as Trust Administrator owes the following duties, *inter alia*, to Certificateholders, including Plaintiff:

   a) to examine any resolutions, certificates, statements, documents or other instruments furnished pursuant to any provision of the PSA, including the ProSupp, and "if any such instrument is found not to conform in any material respect to the requirements of [the PSA], the Trust Administrator shall notify the Certificateholders of such non-conforming instrument…";[8] and

   b) to "establish and maintain, on behalf of the Certificateholders, the Distribution Account" and "withdraw funds from the Distribution Account for distributions to Certificateholders" pursuant to written instructions received from the Master Servicer;[9]

42. Defendant breached each of these contractual provisions.

43. Moreover, according to recent authority, the contract between Plaintiff and Wells Fargo includes both the ProSupp and the PSA. Further, according to *American Home Mortgage*, the allocation of losses should be determined by the ProSupp.

44. On the other hand, Defendant appears to take the position that the only contract that binds its duty to allocate losses is the PSA.

---

[5] PSA, § 3.07(b).
[6] PSA, § 3.07(c).
[7] PSA, §§ 4.03(a), 4.04(a).
[8] PSA, § 9.01.
[9] PSA, §§ 3.09(b); 3.10(b)

45. Either way, Defendant has breached its contractual duties and harmed Plaintiff. Either Defendant was required to allocate losses according to its interpretation of the PSA from the beginning and thus the Certificates would have been valueless on their purchase date and Plaintiff would not have purchased them; or, Defendant is required, as the *American Home Mortgage* decision holds, to conform the loss allocation methods to those described in the ProSupp.

46. Defendant further breached its contractual duties by failing to timely file an *American Home Mortgage*-style proceeding before Realized Losses began to exceed the ProSupp's 1-A-5-4 $226,876 cap on losses to the Class 1-A-5 Certificates. Filing an *American Home Mortgage*-style proceeding would have resulted in certainty of allocation and alerted all existing and potential Certificateholders of the potential conflict between the PSA and the ProSupp.

47. Defendant further breached its contractual duties by failing to provide advance notice that it intended to change the manner in which it would allocate Realized Losses among the various Certificates. Such advance notice would have alerted all existing and potential Certificateholders of the potential conflict between the PSA and the ProSupp, and the Defendant's intention regarding Realized Loss allocation.

48. Defendant further breached its contractual duties by failing to provide notice to Certificateholders that any resolutions, certificates, statements, documents or other instruments did not conform with the PSA.

49. Defendant further breached its contractual duties by failing to recognize any discrepancy between the method of allocating Realized Losses, the language of the PSA Defendant signed, and the allocation set forth in the ProSupp.

50. Plaintiff is entitled to damages equivalent to its current and future losses under the new allocation scheme.

### COUNT II – NEGLIGENCE

51. Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

52. Irrespective of any contract, Defendant had a duty to perform its ministerial acts with due care, in its roles as Master Servicer and Trust Administrator.

53. Defendant was negligent in multiple respects, including but not limited to: (a) failing to notice or give notice of the discrepancy between the allocation statements, the PSA, and ProSupp; (b) unilaterally changing the Realized Loss calculation without advance notice to existing and potential Certificateholders or the Securities and Exchange Commission; (c) unilaterally changing the Realized Loss calculation without first filing a proceeding to obtain judicial instructions to resolve any alleged discrepancy between the ProSupp and the PSA; (d) administering Realized Losses in accordance with the ProSupp from the inception of the Trust and then suddenly changing the administration of Realized Losses to conform with Defendant's interpretation of the PSA; and (e) failing to notify the Trustee of any alleged discrepancy between the PSA and ProSupp, and of Defendant's intention to change the manner in which it allocated Realized Losses.

54. Defendant's negligence damaged Plaintiff in the amount of Plaintiff's purchase price of the Certificates.

### COUNT III – GROSS NEGLIGENCE/WILLFUL MISFEASANCE

55. Plaintiff incorporates by reference the preceding paragraphs of this Complaint.

56. As previously alleged above, Defendant appears to claim that a material discrepancy exists between the PSA and ProSupp in the treatment of loss allocations. Upon

information and belief, there has been no disclosure to investors in the Trust of such material discrepancy.

57. After requesting and receiving direction from the *American Home Mortgage* court, Defendant was, at all relevant times here, in possession of a court order directing that where such a material discrepancy exists, the ProSupp should govern unless the discrepancy was fully revealed to investors.

58. Upon receipt of Plaintiff's demand that Defendant continue to allocate losses according to the ProSupp and to re-state the latest remittance report to repair the economic harm suffered by Plaintiff, Defendant insisted that the PSA was the "governing document" and refused to conform the loss allocations to the terms set forth in the ProSupp – as the "instrument disclosing all material terms and conditions" to the Trust's investors such as Plaintiff.

59. Defendant's willful disregard for the direction previously requested and received from a court in nearly identical circumstances of a material discrepancy constitutes gross negligence and has caused Plaintiff damages in an amount equivalent to its losses under the new allocation scheme. Plaintiff is also entitled to exemplary damages in light of such willful malfeasance and gross negligence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order:

(1) Awarding actual damages to Plaintiff against Defendant sustained as a result of Defendant's breach of the contract, its negligence, or its gross negligence/willful malfeasance, or, in the alternative, rescinding Plaintiff's purchase of the Certificates and returning the purchase price of the Certificates;

(2)   Awarding Plaintiff all attorneys' fees, expert fees, costs and expenses incurred in this action;

(3)   Awarding Plaintiff exemplary damages; and

(4)   Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated this 8th day of December, 2014.

JOHNSON, HEIDEPRIEM
& ABDALLAH, L.L.P.

BY /s/
Scott A. Abdallah (sabdallah@jhalawfirm.com)
Shannon R. Falon (shannon@jhalwfirm.com)
P.O. Box 2348
Sioux Falls, SD 57101-2348
(605) 338-4304

*Attorneys for the Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

/s/
Scott A. Abdallah
Shannon R. Falon